IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 7, 2016

**STATE OF TENNESSEE v. KEITH WARD**

**Appeal from the Criminal Court for Shelby County**
**No. 13-00277     Paula Skahan, Judge**

_____

**No. W2015-00931-CCA-R3-CD  -  Filed August 26, 2016**

_____

The defendant, Keith Ward, was convicted by a Shelby County Criminal Court jury of rape of a child, a Class A felony, and was sentenced by the trial court as a child rapist to 32.5 years at 100% in the Department of Correction.  The sole issue he raises on appeal is whether the evidence is sufficient to sustain his conviction.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Joseph A. McClusky, Memphis, Tennessee (on appeal); and Taurus M. Bailey, Assistant Public Defender (at trial), for the appellant, Keith Ward.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Katherine B. Ratton and Joshua N. Corman, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

On the Friday before Easter 2012, the then eight-year-old victim[1] disclosed to her stepmother that the defendant, who at the time was her stepfather, had awoken her in the middle of the night, carried her to the living room, removed her pants, shorts, and

---

[1] To protect the identity of the minor victim, we do not use her name, the last names of her siblings, or the names of her adult relatives.

underwear, and licked her vagina. The victim's stepmother reported the abuse to the authorities, and the defendant was subsequently arrested and indicted for rape of a child.

The State's first witness at trial was Patricia Lewis, the forensic interview program manager at the Child Advocacy Center in Memphis, who testified that she interviewed the victim on April 12, 2012, about the reported rape. She identified the videotape of that interview, as well as the anatomical drawings she had used with the victim during the interview, which were admitted as trial exhibits.

The victim, who was eleven years old at the time of trial, testified she currently lived with her father and stepmother but that she used to live with her mother, her mother's ex-husband, who was the defendant, and five of her siblings: her sisters, Desiree, Elantra, and Alexis, and her brothers, Eugene and Patrick. She said when she was eight years old and a student at Winchester School, she and her family lived in an apartment in the Kingsgate Apartments, where her mother and the defendant shared one bedroom, her sisters shared a second room, her brother, Patrick, had his own room, and she usually slept on a sofa bed with her brother, Eugene, who used the dining room as his bedroom. She stated that Eugene was one year older than she.

The victim testified that she preferred to sleep in the position against the wall, but one night when she forgot and was sleeping on the edge of the bed, the defendant came into the room, awakened her, carried her to the couch in the living room, pulled down her jogging pants, shorts, and underwear, and licked her for a long time on her private area, which hurt her legs and made her uncomfortable. She said that "when [the defendant] had his hands like around [her] private area it really hurt[]." She eventually "kind of whined and he told [her] to put back on [her] clothes." The defendant then picked her up and carried her back to her bed like a baby, telling her it had been a dream.

The victim testified that after the defendant put her back in the bed, she tried to remain awake and also tried to hug Eugene so that he would be awakened if the defendant returned later that night. She said she did not scream or run to tell her mother because she was afraid she would not believe her. She also worried that the defendant, who used to fight with her mother often, would hurt one of her siblings or her mother or herself.

The victim testified that she eventually disclosed the abuse to her stepmother, with whom she had a close relationship. She said she called her paternal grandmother to ask to be picked up from school and her aunt, who responded, took her to her father's house. That night while her father was at work, her stepmother talked to her about good touches versus bad touches. Her stepmother then went to the kitchen to start to cook, but she asked if they could talk and, after extracting her stepmother's promise that she would not

2

tell anyone, she divulged what had happened. The victim said she did not want her stepmother to tell anyone because she was afraid of how it would affect her family, especially her father, who she worried would fight with the defendant.

The victim testified that her stepmother later took her to their pastor's house, where she repeated her account to her father while in the presence of their pastor. The victim said that her father was very protective of her and that her stepmother had her reveal the abuse to him while in the presence of their pastor to prevent him from taking any rash actions.

The victim testified that she also talked to "Miss Pat" of the Child Advocacy Center. She identified the videotape of that forensic interview, which was then published to the jury. The victim acknowledged that she mentioned in the interview two separate occasions on which the defendant had awoken her from sleep, carried her to the living room couch, removed her clothes, and licked her vagina. She said that both incidents happened during the time she lived in the same apartment. The first time it happened, she was wearing a yellow nightgown with a moon design. Before the first incident, she had not cared where she slept in the bed. Afterwards, however, she had tried to sleep by the wall so that the defendant would have to reach over her brother to get to her.

The victim testified that she later told her mother about the abuse while they were in the counselor's office at her school. During that conversation, her mother told her to tell the truth and reminded her that she had video cameras in the house. According to the victim, her mother's reminder about the cameras made her feel good because she knew the videotapes would show everyone that she was being truthful.

On cross-examination, the victim denied that her mother and father were involved in any custody disputes before she revealed the defendant's abuse. She testified that her stepmother had talked to her about good and bad touches long before their conversation on the day she divulged the abuse. She explained that she and her stepmother had a very good rapport and that her stepmother had told her several times about how she had been inappropriately touched when she was a young girl but had not had the opportunity to tell anyone. The victim said her stepmother asked her regularly whether anyone had inappropriately touched her and told her that she should tell if it ever happened.

On redirect examination, the victim reiterated that she revealed the abuse to her stepmother because they had a close relationship and she felt comfortable talking with her. She denied that her stepmother told her to make up the story or that she fabricated it because she wanted to live with her stepmother and her father. Finally, she testified that everything she had related was the truth.

3

The victim's mother testified that she learned of the abuse on the Monday afternoon following the victim's Easter weekend visitation with her father. She expected the victim to come home from school with Eugene and Desiree but the victim was not with them. After Eugene informed her that the police told him that the defendant had raped the victim, she first tried unsuccessfully to reach the victim's father and stepmother and then called the school, which put her in touch with a social worker. The witness said that she originally did not believe the allegations and that her first thought was to wonder if the victim's father was behind them. The next day, however, she went to the school with Ms. Jackson of the Department of Children's Services and spoke with the victim, who told her that the allegations were true and that she had not told her about the abuse because she did not want to ruin her mother's life.

The witness testified that when she told the victim to be truthful and reminded her about the video cameras in the house, the victim "got happy" because "[s]he felt like [the authorities] could see for themselves what happened." She said she did not, in fact, have any video cameras in the house, but all her children believed she did. She explained that she lied to her children about the cameras in an effort to get them to be truthful about their activities in the home.

The witness testified that at the time of the reported abuse, she and the defendant were living in a three-bedroom Kingsgate apartment with the victim, Elantra, Desiree, Alexis, and Eugene, while her older son, Patrick, lived in a separate apartment in the same complex. The victim and Desiree were supposed to share bedrooms with their older sisters, but both girls preferred to sleep with their brother, Eugene, on a futon bed in the dining room. She recalled that the victim originally slept on the outside of the bed with Desiree in the middle and Eugene against the wall, but "all of a sudden," sometime around Easter, the victim became afraid to sleep on the outside and wanted to instead sleep against the wall.

On cross-examination, the witness denied that she was involved in a custody dispute with the victim's father at the time of the reported abuse. She conceded, however, that the victim's father had filed for custody when the victim was two or three and that the victim's stepmother had more recently been "very adamant about wanting [the victim] to live with her." She said she and the victim's stepmother had simply "agreed to disagree" about it.

The victim's stepmother testified that the victim developed a pink eye infection when she was three years old, which eventually resulted in her losing sight in her right eye. She said the victim's mother had transportation issues during that time and was not getting the victim the appropriate level of medical care, so she and the victim's father sought to gain custody through juvenile court proceedings. They were unsuccessful, and

custody remained with the victim's mother until after the allegations in the instant case arose.

The witness testified that the victim's father picked up the victim from school on the Friday afternoon of Easter weekend, brought her to their home, and then went back to work. During his absence, she gave the victim a bath. The victim appeared "very shaky and nervous" but just shook her head when she asked her what was wrong. She was later combing the victim's hair when the weeping victim laid her head on her leg, asked if she remembered having said that the victim could tell her anything, and related what had happened.

The witness testified that she reassured and comforted the victim and then called the police and child protective services in both Mississippi, where she and the victim's father lived, and in Tennessee, where the incident occurred. The next morning, she, the victim, and the victim's father met at their pastor's house, where the victim told her father what had happened and spoke with the police, who came to take her statement.

The witness testified that she also took the victim to the child advocacy center and to her physician. No examination was performed, however, because the physician was a man and the terrified victim kept screaming "no" when the witness attempted to get the victim to let him examine her. Since the incident with the defendant, the victim had difficulty sleeping, was afraid to go the bathroom alone at night, lost weight, and went from being an "A" to an "F" student.

The defendant chose not to testify and rested his case without presenting any proof. The State elected the second offense in which the victim was dressed in jogging pants, and, following deliberations, the jury convicted the defendant of the indicted offense of rape of a child.

## ANALYSIS

The sole issue the defendant raises on appeal is whether the evidence is sufficient to sustain his conviction. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

"A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"Rape of a child is the unlawful sexual penetration of a victim by the defendant of the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a) (2014). Sexual penetration includes cunnilingus. See id. § 39-13-501(7). Thus, to sustain the conviction, the State had to prove beyond a reasonable doubt that the defendant engaged in cunnilingus with the victim, who was less than thirteen years of age.

The defendant argues that the conviction cannot stand because the victim's claims "were unsubstantiated by any other evidence" and "there were enough minor gaps in the victim's version of events compared to how other witnesses testified to sufficiently call into question her credibility." As an example, he cites the fact that the victim testified that Alexis slept with one of her sisters, while the victim's mother testified that Alexis slept in the same bed with Eugene and the victim. The State argues, among other things, that any inconsistency in the testimony regarding sleeping arrangements is minor and that the jury obviously accredited the testimony of the victim, who provided "unequivocal, detailed testimony" about the rape.

We conclude that the evidence, when viewed in the light most favorable to the State, was more than sufficient for the jury to find the defendant guilty of rape of a child beyond a reasonable doubt. As the State noted, credibility determinations and the resolution of any conflicts in the evidence are within the province of the jury as the trier of fact. We agree with the State that the minor inconsistencies between the victim's testimony and the testimony of other witnesses "does not detract from the victim's unwavering testimony" of the crime. Accordingly, we affirm the defendant's conviction for rape of a child.

## CONCLUSION

Based on our review, we conclude that the evidence is sufficient to sustain the defendant's conviction. Accordingly, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE

7